UNITED STATES *v.* GUARANTY TRUST COMPANY
OF NEW YORK.

No. 120.   Argued November 13, 14, 1934.—Decided December 10,
1934.

*Mr. Justin Miller*, with whom *Solicitor General Biggs, Assistant Attorney General Sweeney*, and *Messrs. Paul A. Sweeney* and *W. Marvin Smith* were on the briefs, for the United States.

*Mr. Theodore Kiendl*, with whom *Mr. John W. Davis* was on the brief, for the respondent.

By leave of Court, *Messrs. Edwin DeT. Bechtel* and *Malcolm S. McNeal Watts* filed a brief as *amici curiae*, on behalf of the American Express Co.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

On September 5, 1929, the United States brought in the federal court for southern New York, this action to recover from the Guaranty Trust Company $160 with interest. That sum was claimed as damages resulting from the payment to the Trust Company, through the Federal Reserve Bank of New York acting as fiscal agent of the United States, of a check, payable to Louis Macakanja drawn on the Treasury of the United States by the disbursing clerk of the United States Veterans' Bureau. The complaint alleged that the letter containing the check had been mailed to the payee in Yugoslavia; that neither the " payee of said check nor any one on his behalf had ever received or endorsed the same "; and that " the letter containing the check was taken or received in Jugoslavia by some person other than the payee thereof, and that thereafter the name of Louis Macakanja was written on the back of the said check by some person other than the payee thereof, and by a person who was not authorized to sign the name of said payee and who had no right, title, or interest in and to said check, with pos-

session thereof, and no right or authority to receive, endorse, or dispose of the same."

The answer set up as a special defense that the " check was negotiated and transferred in the Kingdom of Jugo-Slavia "; that under its law " upon the negotiation and transfer of a check every transferee, if he takes without actual notice of any alleged forgery or other defect, in the absence of fraud or gross negligence, obtains a good title to the instrument, even if the endorsement of the payee is forged, and acquires the right to collect and retain the proceeds "; that " each of the transferees of the check mentioned in the complaint gave valuable consideration and took without notice of any alleged forgery or other defect, and without fraud or negligence, and thereby obtained a good title to the instrument and acquired the right to collect and retain the proceeds "; and that the " defendant under the law of Jugo-Slavia, duly obtained title to said check, as aforesaid, and duly collected and retained the proceeds." [1]

---

[1] The law of the Kingdom of Yugoslavia in reference to checks and bills of exchange, according to the stipulation, was in 1921, and still is, as follows:

" Upon the negotiation and transfer of a check or bill of exchange each transferee, endorsee, or holder thereof obtains a good title to the instrument and acquires the right to collect and retain the proceeds thereof, even though the endorsement of the payee is forged where

"(a). The instrument purports to bear a chain or series of endorsements from the payee of the instrument to the transferee, holder or endorsee thereof; and

"(b) The said transferee, holder or endorsee gives valuable consideration for the instrument; and

"(c) The said transferee, holder or endorsee takes the instrument without actual notice of any forgery or other defect in the instrument and is not guilty of any fraud or gross negligence in taking the instrument.

" The law of Jugo-Slavia further provides that

"(a) When an endorsement follows a blank endorsement there is a presumption of law that the person who executed the endorsement

The case was tried before a jury. The evidence consisted of an agreement as to facts and the cancelled check. The agreement recited, among other things, that the purported endorsement of the payee was a forgery, made in Yugoslavia; that on or about November 30, 1921, the check was transferred and delivered there to the " Merkur " Bank; that the " Merkur " Bank duly endorsed the check and transferred it in Yugoslavia to the " Slavenska " Bank; that the " Slavenska " Bank endorsed and transferred the check in Yugoslavia to the Guaranty Trust Company and forwarded it by mail; that each of these banks paid a valuable consideration, received the check in good faith, took it without notice of the forgery or other defect, and was not guilty of any fraud or negligence; that " the Treasurer of the United States upon receipt of said check paid the same by crediting the Federal Reserve Bank of New York with the amount "; that, in December, 1921, that Bank credited the Trust Company with the amount; that the United States first learned of the forgery on or about April 27, 1926; and that on June 1, 1926, it requested, through the Federal Reserve Bank, reclamation from the defendant, which was denied.

The check, dated October 29, 1921, was payable to the order of " Louis Macakanja, 37 Sasava Kot Glina, Z. P. Maja, Jugoslavia." When presented for payment, it bore what purported to be his endorsement made in ̧the presence of two witnesses and a certification by the Municipal Administration of Maja to the effect that " the holder

has acquired title to the instrument under the blank endorsement; and

"(b) The transferee, holder or endorsee of the instrument is under no duty or obligation to investigate the genuineness of prior endorsements.

" Under the law of Jugo-Slavia, an endorser does not guarantee or warrant the genuineness of prior endorsements."

of the check is identical with the beneficiary thereof" and that the witnesses as well as the receiver of the money had subscribed the instrument. The check bore these further endorsements: "'Merkur' Banking and Exchange Business, Stanko Shon, Zagreb"; "Pay to the order of Guaranty Trust Co. of New York, New York City, N. Y. Slavenska Bank D. D. Zagreb"; also the stamp of the Guaranty Trust Co.: "Previous Endorsements Guaranteed"; and the stamp of the Federal Reserve Bank.

Each party moved for a directed verdict. The District Court directed a verdict for the plaintiff in the sum of $160 with interest from June 1, 1926; and entered judgment for that amount. The Court of Appeals reversed the judgment, 69 F. (2d) 799. This Court granted certiorari.

*First*. The check was both drawn and payable in the District of Columbia. By the law of the District a forged endorsement of the payee's name is declared to be wholly inoperative.[2] Ordinarily, a subsequent bona fide holder for value without notice of the forgery would acquire neither title to the instrument nor the right to enforce payment; and would acquire no right to retain the proceeds if payment were made in ignorance of the forgery. But under settled principles of conflict of laws, adopted by both federal and state courts, the validity of a transfer of a chattel brought into a country by the consent of the

[2] Code of Laws of the District of Columbia, Title 22, § 24, and also § 42 of the New York Negotiable Instruments Law provides: "Where a signature is forged or made without the authority of the person whose signature it purports to be it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto can be acquired through or under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority."

owner is governed by its law; and that rule applies to negotiable instruments. *Embiricos* v. *Anglo-Austrian Bank*, [1905] 1 K. B. 677; *Weissman* v. *Banque de Bruxelles*, 254 N. Y. 488, 494; 173 N. E. 835. Compare *Disconto-Gesellschaft* v. *United States Steel Corp.*, 267 U. S. 22, 28. See *Queensboro Nat. Bank* v. *Kelly*, 48 F. (2d) 574, 576. Here, the rule is particularly applicable; for the Government, having made the check payable to one therein described as resident in Yugoslavia and having mailed it to his Yugoslavia address, must be deemed to have intended that it should be negotiated there, according to the law of that country. It was thereby given something of the quality of a foreign bill; although technically the check was delivered within the District when mailed there. Compare *Koechlin et cie* v. *Kestenbaum Brothers*, [1927] 1 K. B. 889; see Lorenzon, Conflict of Laws Relating to Bills and Notes, (1919) p. 135, n. 267. The law of Yugoslavia provides that the transferee in due course acquires, despite the forgery, not only " a good title to the instrument," but also " the right to collect and retain the proceeds thereof." As the Government sent the check to Yugoslavia and the forged endorsement and the transfers of the check were made there, its law governs the validity of the transfer; and the banks acquired, at least, a good title to the check.[3]

*Second.* The Government contends that although the title to the check may have passed from the payee to the Trust Company, it acquired, as against the drawer, no right either to enforce payment or to retain the proceeds paid. The argument is that, since the check was both drawn and payable within the District, the obligation

---

[3] Compare *McClintick* v. *Cummins*, 3 McLean 158; Fed. Cas. 8,699; *Dundas* v. *Bowler*, 3 McLean 397; Fed. Cas. No. 4,141; *Russell* v. *Grigsby*, 168 Fed. 577, 580; rev. on other grounds, 222 U. S. 149.

arising therefrom is governed by its laws; that, under the law of the District the drawer agreed to pay the check only on the order of the payee; and that since there was no such order and the payment made was in ignorance of the forgery, the money may be recovered as having been paid under a mistake. The law of the District determines the formal and essential validity of the check, the interpretation of the contract, the incidents of the obligation. But the Trust Company does not attempt to enlarge or modify the obligation of the drawer as determined by the law of the District. The question presented is: Has the Trust Company, by acquiring title to the check, acquired the right to enforce the obligation which it represents. The enforcement does not contravene the public policy of the District. The question relates to the incidents of the transfer of title to a chattel; and, hence, is determined by the law of Yugoslavia. The Trust Company is not confronted with any procedural obstacle, like that presented in some jurisdictions where the transferee of a non-negotiable cause of action seeks to sue thereon in his own name. Compare *Harper* v. *Butler,* 2 Pet. 239, 240. Nor is the Trust Company confronted by a divergent public policy of the forum, which forbids its courts from applying the Yugoslavian law. Compare *Bond* v. *Hume,* 243 U. S. 15; *Oscanyan* v. *Arms Co.,* 103 U. S. 261, 277. Indeed, the courts of New York, where this suit was brought, would doubtless give effect to the rule of the foreign law here relied on. Compare *Weissman* v. *Banque de Bruxelles,* 254 N. Y. 488, 494; 173 N. E. 835.

The Government argues that acquisition of the legal title to negotiable paper does not necessarily imply acquisition of a cause of action thereon. It is suggested that even an instrument properly endorsed by the payee so as to transfer the title may fail to confer any right to enforce the obligation of the maker, as where the cause of

action had been lost by a discharge in bankruptcy; and that when the title to the instrument is transferred to a bona fide holder for value without an endorsement, or after maturity, the transferree may fail to acquire a right to enforce payment, because such paper is subject to any defense open as against the payee. But those rules have no application here. The discharge in bankruptcy operates upon the obligation represented by the check regardless of who the holder may be. The transferee without endorsement, or after maturity, acquires the rights which the payee had; and it is those rights only which the Trust Company asserts. To conclude that the forged endorsement was sufficient to pass legal title, but insufficient to transfer the right of the payee to collect the proceeds, would deprive the transfer of " title " of all significance except as regards the right to retain a scrap of worthless paper.[4]

*Third.* The Government contends that irrespective of considerations discussed above, the Trust Company is liable because of its endorsement. The argument is that its endorsement, made when the check was presented for payment through the Federal Reserve Bank of New York, is an independent contract governed by the law of New York, *Spies* v. *National City Bank,* 174 N. Y. 222, 225; 66 N. E. 736; that, by the Negotiable Instruments Law of that State, the endorsement warrants, besides the title, the authenticity of penmanship of the payee or the authorization of the endorsement in his name;[5] and that, if

---

[4] Compare *Texas* v. *White,* 7 Wall. 700, 735; *Meuer* v. *Phenix Nat. Bank,* 94 App. Div. 331, 88 N. Y. S. 83; affd. 183 N. Y. 511, 76 N. E 1100; *Peterson* v. *Swanson,* 176 Minn. 246; 223 N. W. 287; *Beneficial Loan Assn.* v. *Hillery,* 95 N. J. L. 271, 276; 113 Atl. 324.

[5] Negotiable Instruments Law of New York provides:

§ 116. Every endorser who indorses without qualification, warrants to all subsequent holders in due course:

(1) The matters and things mentioned in subdivisions one, two and three of the next preceding section; and

there be doubt as to the meaning and effect of an endorsement under the law of New York, there can be no doubt as to the Trust Company's obligation, because of the terms of its stamp: "Prior endorsements guaranteed." The express guarantee of prior endorsements means no more than what is implied by every unrestricted endorsement; namely that the endorsements were effective to give to the holder a legal title and the right to enforce payment of the check.

*Fourth.* The Government contends that it is entitled to recover because of exceptional rights conferred in express terms by regulations of the Treasury and of the Federal Reserve Bank of New York. A Treasury circular then in effect provided for the handling of Government checks by the Reserve Banks and branches " subject to examination and payment by the Treasurer of the United States." [6] A Reserve Bank circular recited: " The Government has for many years exercised the right of returning at any time warrants and checks which for any cause have not been considered good, and the Federal Reserve Bank of New York as fiscal agent of the United States as a condition of receiving government warrants and checks on the Treasurer of the United States from member banks or through the New York Clearing House reserves the right to charge back any such item and return the same at any time unconditionally to the institution from which it was received." [7]

---

(2) That the instrument is at the time of his endorsement valid and subsisting.

The " matters and things " in § 115 so referred to are:

(1) That the instrument is genuine and in all respects what it purports to be;

(2) That he has a good title to it;

(3) That all prior parties had capacity to contract.

[6] Treasury Department Circular No. 176. December 31, 1919.

[7] Reserve Bank Circular No. 258. March 1, 1920.

The argument is that with knowledge of these regulations the check was presented by the Trust Company for payment through the Reserve Bank of New York, and sent by the Bank to the Treasurer of the United States; that the Treasurer paid the check by crediting the Reserve Bank with the amount, and the Reserve Bank so credited the Trust Company; that the Trust Company was not obliged to avail itself of the facilities of the Reserve Bank; and that having done so with full knowledge of the regulation, it consented that the Government might charge back any such item and return the same at any time unconditionally. *Closter National Bank* v. *Federal Reserve Bank,* 285 Fed. 138, 140, is cited as establishing this proposition. And it is suggested, that, since the rule there declared is controlling, no occasion exists for deciding the question of conflict of laws presented by the petition for certiorari. The rule declared in the *Closter* case has no application here.[8] That case dealt solely with the relation between the holder of the check and the collecting agency employed. As against the United States, the rights of the holder of its checks drawn upon the Treasurer are the same as those accorded by commercial practice to the checks of private individuals. Compare *United States* v. *National Exchange Bank,* 270 U. S. 527, 534; *Lynch* v. *United States,* 292 U. S. 571, 579.

---

[8] The United States was not a party to that litigation. The Closter Bank sued the Reserve Bank, collecting agent, for the proceeds of a check. The court held that it was a term of the employment that the Reserve Bank might charge back any amount paid on a check if the Government refused final payment; and that hence it was unnecessary for the Reserve Bank to prove that the check in question was forged: "By the terms of the collecting agreement under which the defendant in error performed the service, the collection agent had the right, if it acted in good faith, to charge back the item to the plaintiff in error's account, without the necessity of establishing forgery or alteration of the warrant."

Moreover, the Government expressly disclaimed the assertion of a preferred position.[9]

Additional reasons are suggested for affirming the judgment of the Court of Appeals: That the Government cannot recover on the guaranty of prior endorsements, because it has failed to show damage from the alleged breach. That it cannot recover the money as having been paid under a mistake, because it has failed to show " that the defendant cannot retain the money with good conscience." Compare *United States* v. *Chase National Bank*, 252 U. S. 485, 495. That recovery must be denied, regardless of the foreign law, because on the agreed facts, the Government is, under § 24 of the Code of the District, " precluded from setting up the forgery." Compare *Hortsman* v. *Henshaw*, 11 How. 177. Since we sustain the special defense based on the law of Yugoslavia, we have no occasion to pass on these matters.

*Affirmed.*

---

[9] See letter of Jan. 12, 1922, by L. P. Gilbert, Jr., Under Secretary, to The Guaranty Trust Company.