**DUNHAM v. UNITED STATES.**

No. 9779.

Circuit Court of Appeals, Fifth Circuit.

Feb. 25, 1942.

R. A. Hendricks, of Miami, Fla., for appellant.

Herbert S. Phillips, U. S. Atty., of Tampa, Fla., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

John S. Dunham was tried and found guilty on four counts of an indictment charging violations of the mail fraud statute, 18 U.S.C.A. § 338, and he has appealed.

The evidence shows that Dunham moved to Miami, Florida, in 1933; that although he had no experience as a stock market operator, he held himself out as an expert and commenced business as a stock operator and investor; that he sought out and secured investors and explained to each of them that he had a method by which he could and would by stock market trading earn for them at least ten per cent on their investments; and that all above ten per cent would be divided equally. Dunham became a member of the prominent Miami Rod and Reel Club, and moved among the members and explained his plan of operation on the stock market to many of them, and thereby secured clients. He also secured other clients not connected with the club.

Dunham continued his business operations from 1933 until August, 1937, when, due to misuse and dissipation of funds placed in his hands for investment by persons who relied upon and believed in his representations, he discontinued his operations on the stock market. During the period of his operations Dunham secured funds aggregating more than $250,000.00. It is shown that when money was entrusted to him he gave each investor a non-negotiable note; that he guaranteed a ten per cent return on the investment; that each month he would send through the mails what was purported to be a bona fide statement of the standing of the account of the individual investor; that these monthly statements which he mailed out showed a net "profit"; and that many investors after receiving these favorable reports and statements invested more money with defendant from time to time. In truth and in fact there was no "profit" made, for defendant lost money from the commencement to the end of his transactions, and he admitted on the witness stand that he paid such "profits" as he did pay from funds which he had received from investors, and that such payments came from the capital investments.

The defendant further admitted that he at no time informed investors that he was losing money, and that he made monthly statements showing bonus and interest "in order to keep the money I had borrowed, in order to get new money; I testified that that was justified on the basis of what I believed it would bring me in the way of profit, and my creditors in interest and bonus later, that I could raise my working capital by getting a good deal of it in." In answer to a question as to whether the "interest and bonus" payments were paid out of the money he had "received from these people", Dunham said, "It had to be paid out of the money with which I was operating on. * * *

"Q. Then as a matter of fact, this money that you were paying to these people, or some of them, paid and entered on the books as commissions and interest, wasn't anything but the very money they had let you have, wasn't it? A. Yes, that is right,—the money they loaned me, because it had to be." It is further without dispute that the defendant converted to his own use more than $50,000.00 of the funds which had been entrusted to him for investment.

An auditor's report in the record shows that the books of the defendant disclosed that investors were credited with "profits" aggregating $72,589.43; that withdrawals were made amounting to more than $100,-000.00; that various journal entries relating to adjustments between the accounts were made; and that the balance due investors at the close of the operations amounted to more than $160,000.00.

It was and is defendant's contention that the money he received from the different investors was borrowed money; that his non-negotiable notes were given as evidence of his good faith; and that he was not accountable to the investors or anyone else for the way in which he used such funds. The court permitted him to testify that he had taken out insurance to protect his "creditors", and he was given every opportunity to show that his acts were honest and upright.

The evidence shows the existence of a scheme to defraud, and it is clear that the mails were used in furtherance of that scheme. The facts established by the evidence and admitted by the defendant completely made out the case under the four counts of the indictment upon which de-

fendant was convicted, and the fact that Dunham's conviction for embezzlement under a state statute was reversed by the Supreme Court of Florida, Dunham v. State, 140 Fla. 754, 192 So. 324, is not a defense to this indictment which is under the mail fraud statute. Knight v. United States, 5 Cir., 123 F.2d 959, 960; Hart v. United States, 5 Cir., 112 F.2d 128; Spivey v. United States, 5 Cir., 109 F.2d 181.

The indictment was sufficient in form and in substance, and the evidence was abundantly sufficient to establish Dunham's guilt. The court tried in every reasonable way to preserve every substantial right of the defendant; it permitted him wide latitude in presenting his defense, and he was given every opportunity to show, if he could, that he was not guilty as charged. Moreover, the court in its charge to the jury was careful to point out every contention of the defendant, and the charge was full and fair and altogether favorable to him.

The evidence made a case for the jury, and the court committed no error in refusing to direct a verdict of not guilty. No good purpose can be served by traversing the forty-eight assignments of error made by appellant. It is sufficient to say that after a careful examination of each of these assignments we find no reversible error.

The judgment is affirmed.